## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**LOUREN OLIVEROS**, as
Special Administrator of the Estate of
**ANTONIO MUNOZ**, deceased,

       Plaintiff,

  vs.                   No**.**   **CIV-02-0732 MCA/LFG**

**BOARD OF COUNTY COMMISSIONERS
OF BERNALILLO COUNTY,
JAMES GONZALES, RICHARD CASTILLO,
JAY JOHNSTON**, and **JOE BOWDICH**,
in their individual capacities,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the following motions:  (1) *Defendant James Gonzales' Motion for Summary Judgment on Section 1983 Claims* [Doc. No. 75] filed on April 11, 2003; (2) *Defendant Richard Castillo's Motion for Summary Judgment #1 - Section 1983 Claims* [Doc. No. 86] filed on April 28, 2003; and (3) *Defendant Richard Castillo's Motion for Summary Judgment #2 - State Law Tort Claims* [Doc. No. 90] filed on May 5, 2003.  Having considered the submissions of the parties, the relevant law, and otherwise being fully advised in the premises, the Court determines that the motions [Doc. No. 75, 86] filed by Defendants Gonzales and Castillo with respect to Plaintiff's federal

claims under 42 U.S.C. § 1983 must be granted because those Defendants are entitled to qualified immunity.  No other federal claims remain pending in this action, and the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  Therefore, Defendant Castillo's summary-judgment motion regarding Plaintiff's state law claims [Doc. No. 90] is denied without prejudice and Plaintiff's state law claims against all Defendants are dismissed without prejudice.

## I.   BACKGROUND

On June 24, 2002, Plaintiff filed a *Complaint for Civil Rights Violations and State Tort Claims* [Doc. No. 1] containing eight counts.  Count I asserts a claim under 42 U.S.C. § 1983 that Defendants Johnston, Castillo, and Gonzales violated the Fourth and Fourteenth Amendment rights of Plaintiff's decedent, Antonio Munoz, by using excessive and deadly force during a police chase on the streets of the Albuquerque metropolitan area in Bernalillo County, New Mexico, on June 26, 2000.  Count II asserts a claim of municipal and supervisory liability under 42 U.S.C. § 1983 against Defendants Bowdich and the Board of County Commissioners of Bernalillo County.  Counts III through VIII assert a variety of tort claims against Defendants under state law.

On April 15, 2003, Defendants Johnston, Bowdich, and the Board of County Commissioners filed a motion for summary judgment on Plaintiff's claims against them under 42 U.S.C. § 1983.  [Doc. No. 80.]  That motion was later withdrawn [Doc. No. 105] after the parties stipulated to the dismissal of Plaintiff's claims under 42 U.S.C. § 1983 against Defendants Johnston, Bowdich, and the Board of County Commissioners.  [Doc. No.

92, 95.]  After those claims were dismissed, the only federal claims that remained pending were Plaintiff's claims under 42 U.S.C. § 1983 against Defendants Gonzales and Castillo in their individual capacities.

Plaintiff's claims under 42 U.S.C. § 1983 against Defendants Gonzales and Castillo are the subject of summary-judgment motions respectively filed on April 11, 2003, and April 28, 2003.  [Doc. No. 75, 86.]  With respect to Defendant Gonzales' motion, Plaintiff requested and was granted the opportunity to file a surreply.  [Doc. No. 109, 111.]  The undisputed facts and evidence of record submitted with the parties' briefs regarding the pending summary-judgment motions can be summarized in the light most favorable to Plaintiff as follows.

On June 26, 2000, Defendants Gonzales, Castillo, and Johnston were working as sheriff's deputies employed by Defendant Board of County Commissioners.  Defendant Johnston was on patrol at 8:56 a.m. that day in his marked sheriff's department vehicle when he was dispatched to investigate a report of domestic violence at a residential address in the Albuquerque metropolitan area of Bernalillo County, New Mexico.  While on his way to that address, the dispatch informed him that a suspect in the domestic dispute was reported to have left the scene in a black Chevrolet pickup truck with an extended cab.  [Doc. No. 81, Johnston Aff., Ex. 1, 2 to Marcantel Aff.; Doc. No. 77, Gonzales Aff.; Doc. No. 87, Castillo Aff.; Doc. No. 89, Ex. 1, 2.]

At 9:00 a.m., Defendant Johnston observed a black Chevrolet pickup truck matching the description provided by the dispatch as he approached an intersection near the address

of the alleged domestic-violence incident.  The black pickup truck that Defendant Johnston observed was a full-size model with four-wheel drive and an extended cab.  Defendant Johnston observed a temporary license plate on the pickup truck, but he could not match the license plate to the domestic-violence suspect because the caller had not provided the 911 operator with the license plate of the suspect's vehicle.   Defendant Johnston could see that the pickup truck had two occupants:  a driver and a passenger.  Neither Defendant Johnston nor the other sheriff's deputies knew the identities of the pickup truck's occupants at that time.  [Doc. No. 81, Johnston Aff; Doc. No. 89, Ex. 2, 11, 19. ]

At 9:01 a.m., Defendant Johnston attempted to conduct a traffic stop.  After he engaged his overhead lights, the black pickup truck pulled over and appeared to stop.  But when Defendant Johnston got out of his vehicle and approached the pickup truck on foot, the pickup truck sped off and began driving in a reckless manner.  Neither the driver nor the passenger made any attempt to exit the pickup truck before it sped off.  [Doc. No. 81, Johnston Aff., Ex. 1, 2 to Marcantel Aff.; Doc. No. 89, Ex. 2.]

After the black pickup truck sped off from the site of the attempted traffic stop, Defendant Johnston returned to his sheriff's department vehicle and began to pursue the pickup truck.  The pursuit continued from 9:01 a.m. to 9:08 a.m., during which time the following events occurred.  [Doc. No. 81, Johnston Aff., Ex. 1, 2 to Marcantel Aff.]

Defendant Johnston announced his pursuit over the sheriff's department radio. After observing the black pickup truck speeding, running traffic control devices, and crossing into

opposing lanes of traffic, he also announced the words "reckless driving" over the radio.
[Doc. No. 81, Johnston Aff., Ex. 1, 2 to Marcantel Aff.; Doc. No. 89, Ex. 1, 2.]

In response to Defendant Johnston's radio messages, other sheriff's deputies, including Defendants Gonzales and Castillo, began to monitor the pursuit on their radios and join in the pursuit of the black pickup truck. When Defendant Castillo joined the pursuit, he was traveling on the same street as the pickup truck and Defendant Johnston's vehicle, but in the opposite direction. With his emergency lights and siren engaged, Defendant Castillo took up a position in the center turn lane of the street and watched the black pickup truck approach him. Even though there was room for the pickup truck to pass by him on either side of the turn lane, Defendant Castillo was forced to take evasive action because the pickup truck continued to veer directly toward him at a speed of between 60 and 80 miles per hour. The truck continued past Defendant Castillo at a high rate of speed with Defendant Johnston still in pursuit. As the pursuit continued, the pickup truck sideswiped a private vehicle and, at one point, drove up on the sidewalk near a McDonald's restaurant to pass other vehicles stopped at an intersection. [Doc. No. 77, Castillo Aff.; Doc. No. 81, Ex. 3, 5 to Marcantel Aff.]

Before joining the pursuit, Defendant Gonzales heard over the radio that the driver of the black pickup truck was driving recklessly at excessive speeds, had attempted to strike a marked sheriff's department vehicle, had evaded a spike belt deployed by another sheriff's deputy, and had been involved in an accident with a private citizen during the pursuit. After

he caught up to the pursuit, Defendant Gonzales personally observed the black pickup truck go through at least one stop sign without stopping.  [Doc. No. 77, Gonzales Aff.]

While the truck continued northbound through an urban area on Second Street near the Bridge Street overpass, Defendant Johnston succeeded in temporarily stopping the black pickup truck using a standard police maneuver called a "PIT" (or Pursuit Intervention Tactic).  As a result of the PIT maneuver, the black pickup truck temporarily came to rest facing southeast on Second Street, with the curb of the street restraining its ability to move backward.  Defendant Johnston and another sheriff's department employee, Deputy Jason Katz, positioned their marked sheriff's department vehicles in front of the black pickup truck to restrain its forward movement.  Defendant Johnston exited his vehicle and approached the black pickup truck on the driver's side, ordering the driver and passenger to turn off the engine and exit the truck.  [Doc. No. 81, Johnston Aff.; Doc. No. 89, Ex. 1, 7, 9, 12.]

Defendants Gonzales and Castillo each arrived at the scene of the successful PIT maneuver in their marked sheriff's department vehicles.  Defendant Gonzales parked his vehicle in a position facing the black pickup truck approximately forty to fifty feet away. Defendant Castillo also parked his vehicle near the scene.  [Doc. No. 77, Gonzales Aff.; Doc.. No. 87, Castillo Aff.]

After parking their vehicles, Defendants Gonzales and Castillo approached the black pickup truck on foot in an attempt to assist Defendant Johnston.  Along with Defendant Johnston and Deputy Katz, Defendant Castillo shouted commands directing the driver and

the passenger to exit the truck.  [Doc. No. 77, Gonzales Aff.; Doc. No. 81, Ex. 4 to Marcantel Aff.; Doc. No. 87, Castillo Aff.; Doc. No. 89, Ex. 6, 7, 8.]

Neither the driver nor the passenger made any attempt to exit the black pickup truck or turn off the engine at that time.  Instead, the driver began to maneuver the truck back and forth between the curb behind him and the marked sheriff's department vehicles in front of him so that he and his passenger could continue to flee in the truck.  As the driver was maneuvering the pickup truck in this manner, he struck Deputy Katz's vehicle, and Defendant Johnston broke out the driver's side window of the truck with his extendable baton.  Nevertheless, the occupants of the pickup truck succeeded in moving the truck out of the location of the successful PIT maneuver after Defendant Johnston broke out the driver's side window.  By the time the pickup truck left that location, both the front driver's side tire and the rear passenger-side tire had become deflated, causing the truck to travel on two of its rims.  [Doc. No. 77, Gonzales Aff.; Doc. No. 81, Johnston Aff., Ex. 4 to Marcantel Aff.; Doc. No. 87, Castillo Aff.; Doc. No. 89, Ex. 2, 6, 7, 8, 19, 20.]

As the black pickup truck moved from the location of the PIT maneuver, Defendant Gonzales drew his pistol and fired five rounds at the truck.  Analysis of the physical evidence recovered from the truck and its occupants indicates that three of the rounds fired by Defendant Gonzales passed through the driver's side of the truck's windshield, and two of these rounds struck the driver of the truck.  Two of the rounds fired by Defendant Gonzales struck the passenger in the back.  It is probable that these two rounds went through the open driver's side window area of the truck (which had previously been broken out by Defendant

Johnston's baton) before striking the passenger.  There was some evidence of glass on one of the bullet fragments that was later recovered from the passenger's body, but the glass on that bullet fragment did not match the glass from the rear window or windshield of the black pickup truck.  [Doc. No. 77, Gonzales Aff.; Doc. No. 81, Ex. 4 to Marcantel Aff.; Doc. No. 87, Castillo Aff.; Doc. No. 89, Ex. 2, 6, 8, 13, 14, 15, 16, 18.]

When Defendant Castillo heard a shot fired by Defendant Gonzales, Defendant Castillo also began firing his weapon at the truck from his vantage point on the passenger side of the truck.  Defendant Castillo fired a total of six rounds.  Although some of the rounds fired by Defendant Castillo struck the side of the pickup truck, none of them struck the passenger inside.  [Doc. No. 87, Castillo Aff.; Doc. No. 89, Ex. 2, 6, 8, 14, 15, 16.]

There is no dispute that the occupants of the pickup truck had not surrendered and were continuing to flee when the shots were fired.  The parties do, however, dispute the location of Defendant Gonzales, as well as the extent of the truck's movement, at the time the shots were fired.  Defendants maintain that Defendant Gonzales was directly in front of the truck and that the driver of the truck was accelerating away from the location of the PIT maneuver and was about to run him over at the time he fired his weapon.  [Doc. No. 77, Gonzales Aff.; Doc. No. 81, Ex. 4 to Marcantel Aff.; Doc. No. 87, Castillo Aff.; Doc. No. 103, Ex. B, C, D.]  Plaintiff, on the other hand, contends that there were no officers directly in front of the truck [Doc. No. 89, Ex. 9, 10; Doc. No. 113, Ex. 1] and that the truck had just "started to get some movement" from the location of the PIT maneuver [Doc. No. 89, Ex. 2,

11] or was driving around the deputies rather than trying to run them over [Doc. No. 89, Ex. 12] at the time the shots were fired.

After the shots were fired, the black pickup truck continued southbound on Second Street past the location of the sheriff's deputies and then came to a stop.  When the pickup truck stopped, the driver exited the truck and fled on foot.  While other deputies pursued the driver on foot, Defendants Castillo and Gonzales approached the truck and saw the passenger positioned on his knees on the front passenger seat, facing the rear of the seat.  Defendants Castillo and Gonzales removed the passenger from the truck and handcuffed him.  Emergency medical assistance was summoned, but the passenger was pronounced dead shortly thereafter as a result of the gunshot wounds inflicted by Defendant Gonzales.  [Doc. No. 77, Gonzales Aff.; Doc. No. 87, Castillo Aff.; Doc. No. 89, Ex. 6, 12.]

It was later determined that Plaintiff's decedent, Antonio Munoz, was the passenger in the black pickup truck who was struck and killed by the gunfire from Defendant Gonzales' weapon, and that Leonardo Ronquillo was the driver of the black pickup truck.  Mr. Munoz and Mr. Ronquillo were cousins.  Although not known to the sheriff's deputies at the time of the shooting, neither Mr. Ronquillo nor Mr. Munoz were involved in the alleged domestic-violence incident to which Defendant Johnston had responded, but the pickup truck in which they were traveling was stolen.  [Doc. No. 81, Ex. C; Doc. No. 89, Ex. 18.]

## II.   ANALYSIS

### A.   Standard of Review

Summary judgment under Fed. R. Civ. P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed. R. Civ. P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Id. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex, 477 U.S. at 324. In particular, "an expert opinion may not be sufficient to overcome summary judgment 'if it is conclusory and thus fails to raise a genuine issue of material fact.'" Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001) (quoting Matthiesen v. Banc One Mortgage Corp., 173 F.3d 1242, 1247 (10th Cir. 1999). It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for

summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendant's unlawful conduct.  See Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001).  If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity.  See id. at 1156.  If the plaintiff does establish the violation of a clearly-established constitutional or statutory right, then (for purposes of the defendant's summary-judgment motion) the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.  See id.

### B.   Plaintiff's Federal Claims

42 U.S.C. § 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Persons sued in their individual capacity under this civil-rights statute generally are entitled to qualified immunity unless it is shown that their actions violated a specific federal statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue.  See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances," particularly when an official's conduct amounts to "obvious cruelty."  Hope v. Pelzer, 536 U.S. 730, 741, 745 (2002); see, e.g., Holland v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001) (denying qualified immunity to SWAT deputies "for training a firearm directly on a four-year-old child").  The "salient question" is whether the state of the law at the time of the incident gave the defendants "fair warning" that their conduct was unconstitutional.  Hope, 536 U.S. at 741.

Because 42 U.S.C. § 1983 is not an independent source of substantive rights, but rather a mechanism for enforcing federal rights conferred elsewhere, the analysis of Plaintiff's federal civil-rights claims necessarily begins by identifying the specific constitutional right which Defendants Gonzales and Castillo are alleged to have violated.  See Graham v. Connor, 490 U.S. 386, 393-94 (1989).  In this case, the parties disagree about which

provision of the United States Constitution is controlling.  Plaintiff contends that the prohibition on the use of excessive force embodied in the Fourth Amendment applies here, while Defendants Castillo and Gonzales maintain that the Court should use the specific standard applicable to police chases under the substantive component of the Fourteenth Amendment's Due Process Clause.

### 1.      Whether a Seizure Occurred

The determination of which of these two constitutional provisions applies in this instance depends on whether the relevant actions of Defendants Gonzales and Castillo fall under the Fourth Amendment's definition of a "seizure."  The Supreme Court has defined a Fourth Amendment "seizure" as "an intentional acquisition of physical control."  Brower v. County of Inyo, 489 U.S. 593, 596 (1989).  Under this definition, a seizure can occur in either of two ways.  First, a seizure of a person may occur if there is a show of authority (such as verbal commands or the flashing lights of a police car) followed by the person's submission to that authority.  See California v. Hodari D., 499 U.S. 621, 626-27 (1991). Second, an intentional "application of physical force to restrain movement" of a person's body may constitute at least a momentary seizure of that person, even if he or she later escapes.  Id. at 626.

It does not follow, however, that a seizure within the meaning of the Fourth Amendment has occurred whenever there is a show of authority or an application of physical force by a law enforcement officer.  If a show of authority does not cause the person at whom it is directed to stop and submit to that authority, then no seizure has occurred.  See

-13-

id. at 628-29.  Further, an application of physical force to restrain a person's movement must be "willful" and "intentionally applied" in order to constitute a seizure, Brower, 489 U.S. at 596-97, and a subsequent escape terminates such a seizure, see Hodari D., 499 U.S. at 625.

Applying these principles to a high-speed police chase, the Supreme Court has reasoned that "no Fourth Amendment seizure would take place where a 'pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit,' but accidentally stopped the suspect by crashing into him." County of Sacramento v. Lewis, 523 U.S. 833, 844 (1998) (quoting Brower, 489 U.S. at 597).  Thus, where an unintended harmful consequence results from a law enforcement officer's unsuccessful attempt to seize a person during a chase, the Fourth Amendment does not apply; instead the Court must apply a more narrow and restrictive variety of substantive due-process analysis, under which there can be no liability absent a specific "intent to harm suspects physically or to worsen their legal plight."  Id. at 854.

The Tenth Circuit has interpreted the Supreme Court's opinion in Hodari D. to mean that "when law enforcement officers shoot at a fleeing suspect, a 'seizure' occurs only if the shot strikes the fleeing person or if the shot causes the fleeing person to submit to this show of authority."  Bella v. Chamberlain, 24 F.3d 1251, 1255 (10th Cir. 1994); accord Latta v. Keryte, 118 F.3d 693, 700 (10th Cir. 1997).  In this case, the undisputed facts and evidence of record show that the shots fired by Defendant Castillo did not strike Plaintiff's decedent, Mr. Munoz.  The undisputed facts and evidence of record also show that the occupants of the black pickup truck did not submit to Defendant Castillo's show of authority.  Rather, the

-14-

black pickup truck in which Mr. Munoz was traveling continued fleeing from the sheriff's deputies after the shots were fired. For these reasons, the Court concludes that the shots fired by Defendant Castillo did not constitute a seizure under the Fourth Amendment.[1]

The Court reaches a different conclusion with respect to Defendant Gonzales. It is undisputed that the two shots which struck and killed Plaintiff's decedent, Mr. Munoz, were fired from Defendant Gonzales' weapon. "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tenn. v. Garner, 471 U.S. 1, 7 (1985). Thus, if "law enforcement officers shoot at a fleeing suspect" in order to stop him, and if "the shot strikes the fleeing suspect," then a seizure within the meaning of the Fourth Amendment has occurred. Bella, 24 F.3d at 1255.

Defendant Gonzales tries to avoid this conclusion by claiming that Mr. Munoz's status as a passenger in the black pickup truck made him akin to a hostage or an innocent bystander, rather than a fleeing suspect. Defendant Gonzales also claims that the shooting of Mr. Munoz was accidental because the intended target of Defendant Gonzales' shooting was the driver of the black pickup truck, Mr. Ronquillo. To support these claims, Defendant Gonzales cites to authorities holding that when a law enforcement officer shoots at a fleeing suspect and the shot accidentally hits a hostage or innocent bystander, the hostage or

---

[1]To the extent that Defendant Castillo's use of deadly force is governed by the Fourth Amendment by virtue of his participation, or failure to intervene, in the conduct of other deputies, he is entitled to qualified immunity with respect to Plaintiff's Fourth Amendment claims for the same reasons that Defendant Gonzales is entitled to qualified immunity with respect to those claims.

innocent bystander who is struck by the officer's bullet has not been seized within the meaning of the Fourth Amendment. See Childress v. City of Arapaho, 210 F.3d 1154, 1157 (10th Cir. 2000); cf. Apodaca v. Rio Arriba County Sheriff's Dep't, 905 F.2d 1445, 1447 (10th Cir. 1990) (concluding that a motorist was not seized under the Fourth Amendment when she was accidentally struck and killed by a law enforcement officer's vehicle while the officer was responding to a call).

Viewing the evidence of record in the light most favorable to the Plaintiff, however, a factfinder could reasonably infer that Mr. Munoz was not a hostage or innocent bystander and that the sheriff's deputies involved in the pursuit of the black pickup truck did not treat him as such.  In particular, there is evidence that after Defendant Johnston's successful PIT maneuver, the sheriff's deputies ordered both the driver and the passenger to exit the vehicle, and neither of them complied with these commands.  Further, it is not disputed that Mr. Munoz was initially handcuffed and taken into custody after the driver stopped and abandoned the pickup truck a short while after the shots were fired.  A jury could find that these actions are not consistent with the belief that Mr. Munoz was a hostage or innocent bystander at the time of the shooting.

Further, the Court is not persuaded by Defendant Gonzales' argument that no seizure occurred because he was attempting to aim his weapon at the driver of the black pickup truck at the time he shot Mr. Munoz.  While recognizing that the Fourth Amendment only applies to intentional seizures, the Supreme Court has cautioned that:

> In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

Brower, 489 U.S. at 598-99. In this case, a jury could reasonable infer from the evidence of record that, although the bullets fired from Defendant Gonzales' weapon were intended for the driver of the pickup truck, the purpose of shooting at the driver was to stop the pickup truck so that both the driver and the passenger could be taken into custody. Under this view of the evidence, Mr. Munoz was seized under the Fourth Amendment when he was struck by the shots fired from Defendant Gonzales' weapon.

Addressing an analogous fact pattern in which an officer shot the passenger in a fleeing vehicle while intending to stop the vehicle by shooting the driver, the Eleventh Circuit concluded that the passenger's excessive-force claim against the officer was properly analyzed under the Fourth Amendment. See Vaughan v. Cox, 264 F.3d 1027, 1033 (2001) (hereinafter Vaughan I), vacated on other grounds by, 536 U.S. 953 (2002). The Eleventh Circuit did not change this conclusion on remand. See Vaughan v. Cox, 316 F.3d 1210, 1212 (11th Cir.) (hereinafter "Vaughan II"), cert. denied, ___ U.S. ___, 123 S. Ct. 2252 (2003). Citing the passage from Brower quoted above, the Eleventh Circuit reasoned that "[i]t is not necessary for the means by which a suspect is seized to conform exactly to the means intended by the officer." Vaughan I, 264 F.3d at 1033. The Eleventh Circuit also found it irrelevant that the passenger was not actually taken into custody until after the chase

came to an end because "'the application of physical force to restrain movement, even when it is ultimately unsuccessful' is sufficient to constitute a seizure" under these circumstances. Id. (quoting Hodari D., 499 U.S. at 626).

In another similar case, the Sixth Circuit reasoned that by shooting at the driver of a moving car, an officer "intended to stop the car, effectively seizing everyone inside," including the passenger who was struck by the officer's bullet. Fisher v. City of Memphis, 234 F.3d 312, 318-19 (6th Cir. 2000). Under these circumstances, the passenger was seized within the meaning of the Fourth Amendment. Id. The Sixth Circuit was careful to distinguish this situation, in which the officer intended "to stop the car *and* its passengers," from a hostage situation, in which "an officer is attempting to shoot one individual (the fleeing felon) and avoid another (the hostage)." Id. at 318 n.2.

This Court is persuaded by the reasoning employed by the Eleventh and Sixth Circuits in the cases cited above. Thus, the Court determines that the undisputed facts and evidence of record support the conclusion that Defendant Gonzales seized Plaintiff's decedent, Mr. Munoz, within the meaning of the Fourth Amendment by striking him with two bullets that were fired from Defendant Gonzales' weapon.

## 2. **Reasonableness of the Seizure**

The Court next turns to the question of whether Defendant Gonzales' use of deadly force against Plaintiff's decedent was unreasonable or excessive. The Supreme Court and the Tenth Circuit have recognized two types of theories under which the Fourth Amendment may permit a law enforcement officer to use deadly force: the self-defense theory and the

fleeing-felon theory. Both of these theories are raised in the parties' briefs and are relevant under the undisputed facts and evidence presented in this case. The Court first analyzes Plaintiff's claims under the self-defense theory and then turns to the fleeing-felon theory.

###           a.        Self-Defense Theory

It is well settled that "[a]n officer's use of deadly force in self-defense is not constitutionally unreasonable." Romero v. Bd. of County Comm'rs, 60 F.3d 702, 704 (10th Cir. 1995). Thus, where a suspect poses an "immediate threat" of serious physical harm to an officer, the use of deadly force by that officer (or others acting in his defense) generally does not violate the Fourth Amendment. Garner, 471 U.S. at 11; Graham, 490 U.S. at 396.

In support of his self-defense theory in this case, Defendant Gonzales has presented evidence that the driver of the black pickup truck made eye contact with him and was driving directly at him at the time he fired his weapon at the truck. There is also evidence that three of the rounds fired by Defendant Gonzales passed through the windshield of the pickup truck from a close distance. Based on this evidence, Defendant Gonzales asserts that he is entitled to summary judgment on the grounds that he fired his weapon in self-defense when confronted with an immediate threat of being run over by the truck. See Romero, 60 F.3d at 704.

Plaintiff seeks to refute Defendant Gonzales' self-defense theory in two ways. First, Plaintiff points to evidence from which a jury could infer that Defendant Gonzales was not in immediate danger at the time the shots were fired. Second, Plaintiff contends that even if Defendant Gonzales was in immediate danger at the time he fired his weapon, he cannot

prevail on his self-defense theory because his "own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995).

In support of the latter theory, Plaintiff relies on the deposition testimony of his police-procedures expert to support the assertion that Defendant Gonzales recklessly or deliberately created the need to use deadly force by approaching the truck "in a frenzied and disorganized manner, in violation of well-established police practices." [Doc. No. 85, at 11, 18; Doc. No. 89, at Ex. 3.]  For the following reasons, the Court determines that the evidence of record does not create a genuine issue of material fact in support of the theory that Defendant Gonzales recklessly or deliberately created the need to use deadly force in this case.

While the Tenth Circuit has recognized a danger-creation exception to the self-defense theory in the context of excessive-force claims, that exception is a narrow one.  Courts may only scrutinize the officer's seizure itself, not the officer's conduct "'leading to the seizure, for reasonableness under the Fourth Amendment.'" Bella, 24 F.3d at 1256 (quoting Cole v. Bone, 993 F.2d 1328, 1333 (8th Cir. 1993)).  Thus, "in order to constitute excessive force" under Plaintiff's danger-creation theory, the officer's "conduct arguably creating the need for force must be immediately connected with the seizure and must rise to the level of recklessness, rather than mere negligence." Cram, 252 F.3d at 1132; accord Romero, 60 F.3d at 705.  To expand the exception beyond these narrow limits would run afoul of the Supreme Court's holdings in Lewis, 523 U.S. at 843-44, that the Fourth Amendment does not apply to an officer's pre-seizure conduct during a police chase, and that "even precipitate

-20-

recklessness" is not sufficient to establish an individual officer's liability "when unforeseen events demand an officer's instant judgment" prior to a seizure. Id. at 853. Accordingly, the Court's Fourth Amendment analysis does not encompass the deputies' initial decision to pursue the black pickup truck. Such pre-seizure conduct of the deputies is not subject to the reasonableness requirement of the Fourth Amendment. See Lewis, 523 U.S. at 843-44.

The actions of Defendant Gonzales that are immediately connected with the seizure in this instance concern his approach to the black pickup truck after Defendant Johnston successfully executed the PIT maneuver on Second Street. See Romero, 60 F.3d at 704-05. Even when viewed in the light most favorable to Plaintiff, the evidence of record does not support a reasonable inference that Defendant Gonzales recklessly or deliberately created the need to use deadly force during that time frame.

A finding of recklessness generally requires "a wanton or obdurate disregard or complete indifference to risk." Medina, 960 F.2d at 1496; accord Apodaca, 905 F.2d at 1447 n.3. In excessive-force cases, the Tenth Circuit has allowed plaintiffs to proceed to trial on a theory of recklessness in creating the need for deadly force where there was eyewitness testimony that the officers chose to immediately confront a stationary suspect whom they knew was emotionally distraught and armed with a knife or a gun, under circumstances where there was time to pause and gather more information on the situation. See Sevier, 60 F.3d at 701 n. 10; Allen v. Muskogee, 119 F.3d 837, 840-41 (10th Cir. 1997). But the Tenth Circuit has declined to base a finding of recklessness on the mere fact that a law enforcement officer's decision to approach a dangerous suspect, or the officer's failure to take cover in

the moments preceding a seizure, may have contributed to the need for the use of deadly force.  See Cram, 252 F.3d at 1132; Romero, 60 F.3d at 704-05; Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995).  In addition, the Tenth Circuit has not found expert opinions or other evidence regarding the violation of standard police procedures to be sufficient to establish an individual officer's recklessness in this context.  See Cram, 252 F.3d at 1133; Romero, 60 F.3d at 705.

This case is distinguishable from Sevier and Allen because Plaintiff has presented no eyewitness testimony that Defendant Gonzales knew the occupants of the black pickup truck were emotionally distraught or armed with a knife or gun at the time he got out of his vehicle and began to approach the truck on foot.  While it might have been possible for Defendant Gonzales to retreat or take cover if he had correctly predicted that the truck was going to break free from the vehicles parked in front of it, such a failure to retreat or take cover does not amount to reckless creation of the need to use deadly force in this instance, and an expert opinion with regard to a breach of standard police procedures does not establish a genuine issue of material fact on this claim.  See Cram, 252 F.3d at 1132-33; Romero, 60 F.3d at 704-05; Wilson, 52 F.3d at 1554.

Plaintiff also has presented insufficient evidence to support a theory that Defendant Gonzales *deliberately* created the need to use deadly force.  A standard which relies on "deliberate" conduct "is sensibly employed only when actual deliberation is practical," Lewis, 523 U.S. at 851, not "when unforeseen circumstances demand an officer's instant judgment," id. at 853.  This case clearly falls into the latter category.  Therefore, there is no

basis on which to conclude that Defendant Gonzales deliberately created the need to use deadly force by the manner in which he approached the black pickup truck.

Nevertheless, Plaintiff may still refute Defendant Gonzales' self-defense theory by presenting evidence that Defendant Gonzales was not in immediate danger at the time the shots were fired. In particular, Plaintiff points to evidence suggesting that two of the rounds fired from Defendant Gonzales' weapon may have passed through the open driver's-side window of the pickup truck and that those two rounds are the ones which struck and killed Mr. Munoz. Plaintiff also points to evidence which may indicate that Defendant Gonzales was not directly in front of the pickup truck, or that the pickup truck may have tried to drive around the officer rather than directly toward him, or that the pickup truck may have just "started to get some movement" from the location of the PIT maneuver, at the time that the shots were fired. [Doc. No. 85, at 7.] The Court concludes that this evidence is sufficient to create a factual dispute as to whether the black pickup truck posed an *immediate* threat of serious physical harm to Defendant Gonzales at the time he fired his weapon.

### b.      Fleeing Felon Theory

The presence of a factual dispute regarding whether Defendant Gonzales acted in self-defense does not end the inquiry, because even if Defendant Gonzales did not act in self-defense, his use of deadly force still may be constitutionally permissible under a fleeing-felon theory, see Ryder v. City of Topeka, 814 F.2d 1412, 1419 (10th Cir. 1987), and Defendant Gonzales still may be entitled to qualified immunity, see Vaughan II, 316 F.3d at 1213-14. Accordingly, the Court next examines Defendant Gonzales assertion that he is

entitled to summary judgment in this case on a fleeing-felon theory, and under the doctrine of qualified immunity.

As a preliminary matter, Plaintiff contends that the Court should not consider Defendant Gonzales' fleeing-felon theory because it was not raised by Defendant Gonzales until he filed his reply brief. [Doc. No. 85, at 16-17 n.5; Doc. No. 101, at 13-15.] The Court finds that this contention is without merit. In support of his summary-judgment motion, Defendant Gonzales initially asserted that his conduct was governed by the Fourteenth Amendment's Due Process Clause rather than the Fourth Amendment. Plaintiff's response brief argued that the Fourth Amendment applied and cited Ryder, 814 F.2d at 1419, for the proposition that either a self-defense theory or a fleeing-felon theory may justify the use of deadly force under the Fourth Amendment. [Doc. No. 85, at 16.] While Plaintiff only argued against the self-defense theory in his response brief, he was permitted to file a surreply in order to address any new arguments or evidence presented in Defendant Gonzales' reply brief. [Doc. No. 112.] Under these circumstances, the fleeing-felon theory advanced by Defendant Gonzales is properly before the Court and will not be stricken. See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-65 (10th Cir. 1998).

Further, the fact that Defendant Gonzales may have subjectively believed he was firing his weapon in self-defense does not preclude him from raising the fleeing-felon theory. For purposes of the Fourth Amendment analysis, Defendant Gonzales' intent is only relevant to determining whether a seizure occurred, as explained in Section II.B.1 above. The inquiry into whether that seizure amounted to excessive or unreasonable force "is an objective one:

-24-

the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. Thus, apart from determining that the evidence of record supports the inference that Defendant Gonzales intentionally fired his weapon in order to stop the black pickup truck and its occupants, the Court need not further examine the officer's subjective motivations to determine the precise method or purpose of effecting the seizure.

In support of his fleeing-felon theory, Defendant Gonzales asserts that his use of deadly force was reasonable in this case under the factors articulated in Graham, 490 U.S. at 396, namely "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." See, e.g., Scott v. Clay County, 205 F.3d 867, 876-78 (6th Cir. 2000) (applying these factors to an officer's use of deadly force against a passenger in a fleeing motor vehicle). Plaintiff, on the other hand, cites to the fleeing-felon theory articulated in Ryder, 814 F.2d at 1419.

The relevant portions of Graham and Ryder both cite to Garner. In Garner, the Supreme Court stated that a law enforcement officer's use of deadly force is justified under a fleeing-felon theory where: (1) "the suspect threatens the officer with a weapon or there is probable cause to believe that he committed a crime involving the infliction or threatened infliction of serious physical harm," (2) the officer's use of deadly force is "necessary to prevent escape," and (3) "where feasible, some warning has been given." Garner, 471 U.S. at 11-12; accord Ryder, 814 F.2d at 1418; Vaughan II, 316 F.3d at 1213.

The Tenth Circuit has explained that the first element of this test "does not require that the officer's life actually be threatened by the suspect.  Rather, the officer is allowed to infer that the suspect is inherently dangerous by the violent nature of the crime."  Ryder, 814 F.2d at 1419.  Further, "[a]lthough a crime may not be so inherently dangerous as to automatically justify an officer's use of deadly force in apprehending a fleeing suspect, there may nonetheless be other facts that would provide the officer with probable cause to believe that a fleeing suspect presents a danger to himself or the community," thereby justifying the use of deadly force.  Id. at 1420-21.

To establish probable cause that such a danger exists, law enforcement officers cannot simply rely on the fact that a suspect traveling in a motor vehicle has refused to submit to their show of authority and is attempting to flee.  See United States v. Bradley, 196 F.3d 762, 768-69 (7th Cir. 1999); Vaughan I, 264 F.3d at 1034-35; Abraham v. Raso, 183 F.3d 279, 293 (3d Cir. 1999).  Neither a mere traffic violation, see Bradley, 196 F.3d at 765, 768-69, nor a "fraudulent theft," Ryder, 814 F.2d 1420, have been found to constitute the type of violent crime that may provide a justification for the use of deadly force.

On the other hand, a law enforcement officer's observation of severely reckless driving in the proximity of other officers or innocent private citizens during a police pursuit may establish probable cause to believe that the suspects in the vehicle have committed a crime or engaged in other conduct involving the infliction or threatened infliction of serious physical harm, as required under the first element of the Garner test.  See Dudley v. Eden, 260 F.3d 722, 727 (6th Cir. 2001); Scott, 205 F.3d at 877; Smith v. Freland, 954 F.2d 343,

347 (6th Cir. 1992); Cole, 993 F.2d at 1333-34; Bethley v. City of Spencer, 37 F.3d 1509,

1994 WL 573765, at *3 (10th Cir. 1994) (unpublished disposition);  cf. Graham, 490 U.S.

at 396 (noting that the reasonableness of an officer's use of force may depend in part on "the

severity of the crime at issue").   In such cases, the use of deadly force is not precluded by

the fact that a non-violent offense, such as a minor traffic violation, may have provided the

initial reason for attempting to stop the suspect before the pursuit began.  See, e.g., Smith,

954 F.2d at 344 (noting that the officer "gave pursuit" after the suspect "ran a stop sign");

Cole, 993 F.2d at 1330 (noting that a "state trooper began pursuing the truck" after the truck

drove "through a toll booth . . . without stopping to pay the toll"); cf. Hicks v. Woodruff, 216

F.3d 1087, 2000 WL 854269, at *3 (10th Cir. 2000) (unpublished disposition) (noting that

"plaintiff, by his own actions, altered the nature of the incident when he attacked [the officer]

and took his gun").

        In the present case, it is undisputed that at the time of the shooting, Defendant

Gonzales was aware that the black pickup truck had engaged in reckless driving at high

speeds through a populated urban area during the pursuit that preceded the seizure.   In

particular, the *Memorandum In Support of Defendant James' Gonzales' Motion for Summary

Judgment on Section 1983 Claims* [Doc. No. 76] contains the following statements of fact

which are supported by the evidence of record and which are not disputed in Plaintiff's

response brief [Doc. No. 85].

        8.      The driver of the truck began driving in a reckless manner.

9.      Deputy Johnston reported over the radio that he was in pursuit; while in pursuit, Deputy Johnston observed the black truck speeding, running traffic control devices, and crossing into opposing lanes of traffic.

. . .

13.     After the truck crossed the center universal turn lane into oncoming westbound traffic on Arenal, Deputy Richard Castillo positioned his vehicle in an attempt to slow the truck, but the truck continued at its high rate of speed right at Deputy Castillo.

14.     Deputy Castillo pulled out of the way of the truck and the truck passed by with Deputy Johnston still in pursuit.

15.     The pursuit continued with the truck proceeding recklessly, and near 8th Street and Bridge, the truck sideswiped a private vehicle.

. . .

17.     Following the successful P.I.T., the truck was stopped and reoriented facing southeast on Second Street.

. . .

22.     Defendant Gonzales heard over the radio that the driver of the black truck was driving recklessly and had attempted to strike a patrol vehicle. Deputy Gonzales had heard that Deputy Adriana Escalante had deployed a spike belt at the intersection of Arenal and Isleta but that the truck had evaded the spike belt.  Defendant Gonzales had heard that the black truck was traveling at excessive speeds and had been involved in an accident with a private citizen during the pursuit.

. . .

25.     Deputy Johnston had exited his vehicle and was approaching the black truck on the driver's side, ordering the driver and passenger to turn off the engine and exit the vehicle.

26.     Neither the driver nor his passenger, later identified as the decedent, attempted to exit the vehicle.

-28-

      27.     Instead, the driver began reversing and accelerating and striking Deputy Katz' vehicle in an attempt to flee.

[Doc. No. 76, at 4-6.]  Except for asserting that the sheriff's deputies should not have pursued the fleeing pickup in the first place and noting that Defendant Johnston may have attempted to execute the PIT maneuver several times before he succeeded, Plaintiff does not dispute these facts.  [Doc. No. 85, at 4-6.]  Consequently, they are deemed admitted under D.N.M. LR-Civ. 56.1(b).

Based on these undisputed facts, Defendant Gonzales had probable cause to believe that the occupants of the pickup truck "committed a crime involving the infliction or threatened infliction of serious physical harm."  Garner, 471 U.S. at 11.  Further, Defendant Gonzales was "allowed to infer that the suspect is inherently dangerous by the violent nature of the crime."  Ryder, 814 F.2d at 1419.  Thus, the first element of the Garner test is satisfied based on undisputed facts.

The Court further concludes that the second element of the Garner test is satisfied because a reasonable officer under the circumstances could have concluded that the use of deadly force was "necessary to prevent escape."  Garner, 471 U.S. at 11.  In this regard, Plaintiff has not disputed that the occupants of the black pickup truck had not surrendered (despite being given the opportunity to do so) or that the occupants were continuing to flee in a full-size, four-wheel drive, extended-cab pickup truck at the time the shots were fired.  Thus, there is no question that the occupants of the pickup truck were "actively attempting

to evade arrest by flight." Graham, 490 U.S. at 396; accord Bethley, 37 F.3d 1509, 1994 WL 573765, at *3.

According to the undisputed facts, Defendant Gonzales also was aware at the time of the shooting that the sheriff's deputies already had employed several other tactics aimed at stopping the black pickup truck and its occupants, and that none of these tactics had been successful. The sheriff's deputies' unsuccessful tactics included turning on their emergency lights and sirens, laying down a spike belt, attempting the PIT maneuver several times, blocking the pickup truck with their police cars, issuing verbal commands, and smashing the driver's-side window with an expandable baton. As the black pickup truck started to get some movement toward breaking free from the police vehicles parked in front of it, Defendant Gonzales had to decide "[i]n an instant . . . whether to allow his suspect[s] to escape." Smith, 954 F.2d at 347.

Plaintiff contends that it was not necessary to use deadly force to prevent the escape at that moment because, according to his police-procedures expert, there were still other options available. The Court concludes that the opinion of Plaintiff's expert concerning the possible availability of less intrusive measures does not create a genuine issue of material fact as to an individual officer's liability under the Fourth Amendment in this context. See Cram, 252 F.3d at 1133. If the Court were to follow the approach of Plaintiff's police-procedures expert and consider the abstract possibility that an escape could have been prevented at some other time by less intrusive means, the Court "would be evaluating the officers' conduct from the 20/20 perspective of hindsight rather than from the perspective

of an officer making split-second judgments on the scene." Id.  Such hindsight evaluations are contrary to the Supreme Court's instruction that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and thus "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396; accord Cole, 993 F.2d at 1334.

The Court further concludes that, based on the undisputed facts, Defendant Gonzales' conduct did not run afoul of the warning requirement articulated in Garner, 471 U.S. at 11-12.  In this regard, the Court notes the undisputed fact that other sheriff's deputies at the scene had already given verbal commands for the occupants to turn off the engine and exit the black pickup truck before the shooting began.  "Garner refers only to 'some warning,'" and the Tenth Circuit thus far has "decline[d] to decide what warning would be sufficient." Ryder, 814 F.2d at 1418 n.15 (citation omitted).

Moreover, a warning is required only "where feasible," Garner, 471 U.S. at 11-12; Wilson, 52 F.3d at 1554.  In this instance, a reasonable officer could conclude that a further warning beyond those issued by the other sheriff's deputies was not feasible given the undisputed fact that the suspects had not responded to numerous prior verbal commands and were partially shielded in a large moving vehicle while Defendant Gonzales remained outside the vehicle on foot.  In this regard, the undisputed facts of this case are distinguishable from

-31-

Vaughan I, 264 F.3d at 1035, where there was evidence that the suspects' vehicle had not menaced other drivers and that the officer was traveling parallel to the suspects on an interstate highway for at least thirty to forty-five seconds, thus providing a clear opportunity to warn them before opening fire.  Further, the Vaughan I court expressly noted that if the suspects were proven to have represented a threat to the officer or others on the road (by, for example, "ramming" the officer's vehicle), that fact would suggest that it was not feasible for the officer to give a warning.  Id.  In this case, it is undisputed that the black pickup truck struck Deputy Katz's vehicle while the suspects were maneuvering the truck back and forth from the location of the PIT maneuver.  For all of the above reasons, Plaintiff has failed to demonstrate that Defendant Gonzales' use of deadly force was in violation of the fleeing-felon rule articulated in Garner, 471 U.S. at 11-12.

The Court further concludes that Defendant Gonzales is entitled to qualified immunity because, to the extent he was mistaken in his belief that the use of deadly force was justified in this instance, such a mistake was a reasonable one under the circumstances.  In order to defeat the defense of qualified immunity that is raised in Defendant Gonzales' summary-judgment motion, it is Plaintiff's burden to show not only that Defendant Gonzales' actions violated a specific federal statutory or constitutional right, but also that the rights which Defendant Gonzales allegedly violated were clearly established at the time of the conduct at issue.  See Oliver, 209 F.3d at 1185.  Plaintiff has failed to meet this burden here.

While there is no doubt that the law governing an officer's use of deadly force against a fleeing felon was clearly established in Garner, 471 U.S. at 11-12, the Court's inquiry

"must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001); accord Holland, 268 F.3d at 1196. The Court must consider "'whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*.'" Holland, 268 F.3d at 1196 (quoting Saucier, 533 U.S. at 202) (emphasis added).

Further, a claim of excessive force and a defense of qualified immunity require distinct inquiries into the reasonableness of an individual officer's conduct.

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

Saucier, 533 U.S. at 205. Thus, for example, "an officer would be justified in using more force than in fact was needed" if the officer "reasonably, but mistakenly, believed that a suspect was likely to fight back." Id.

Assuming that Defendant Gonzales correctly perceived the relevant undisputed facts in this case, he could have reasonably encountered some difficulty in applying the Garner criteria to those facts. For example, the Tenth Circuit has not provided much guidance as to when the type of warning contemplated in Garner is feasible and what the content of that warning should be. See Ryder, 814 F.2d at 1418 n.15. Further, the reported opinions from other circuits suggest that during the pursuit of a motor vehicle, the difference between a

reasonable use of deadly force and an excessive one is largely a matter of degree.  At one end of the spectrum are cases such as <u>Cole</u>, 993 F.2d at 1333-34, which granted summary judgment in favor of officers who used deadly force to stop an eighteen-wheel tractor trailer that was driving recklessly at speeds of up to 90 miles per hour and attempting to ram pursuing police cars on a congested interstate highway.  At the other end of the spectrum are cases such as <u>Bradley</u>, 196 F.3d at 768-69, which upheld the criminal conviction of an officer who fired his weapon at a vehicle simply because the driver hesitated in pulling over for an otherwise routine traffic stop.

The present case falls within the "sometimes 'hazy border'" between these two extremes.  <u>Saucier</u>, 533 U.S. at 206 (quoting <u>Priester v. Riviera Beach</u>, 208 F.3d 919, 926-27 (11th Cir. 2000)).  While not the type of eighteen-wheeler that confronted the officers in <u>Cole</u>, 993 F.2d at 1333-34, the truck in which Plaintiff's decedent was traveling was a full-sized, four-wheel-drive, extended cab pickup truck of considerable size and weight.  Unlike the officer in <u>Bradley</u>, 196 F.3d at 768-69, the undisputed facts do not support a reasonable inference that Defendant Gonzales immediately resorted to the use of deadly force when first confronted with the large pickup truck's noncompliance.  Instead, Defendant Gonzales held his fire until after the occupants of the truck had engaged in a considerable amount of reckless driving, repeatedly refused to surrender or otherwise comply with the commands of other officers, and caused the truck to strike and move from the police vehicles attempting to block its path.  The Court concludes that the state of the law on June 26, 2000, was not sufficiently clear to give Defendant Gonzales "fair warning" of the unconstitutionality of his

use of deadly force under these circumstances.  Hope, 536 U.S. at 741; see Vaughan II, 316 F.3d at 1213-14.

Finally, Defendant Gonzales' decision to fire upon the pickup truck does not evince the type of obvious cruelty exemplified by the facts in Holland, 268 F.3d at 1197, where officers needlessly pointed their weapons at young persons who has completely surrendered, or Hope, 536 U.S. at 745, where prison guards deliberately tormented an inmate over a period of several hours.  This case is not one in which an officer is reasonably expected to know that his conduct violates clearly established constitutional standards despite the presence of novel factual circumstances.  Consequently, Defendant Gonzales is entitled to qualified immunity with respect to Plaintiff's excessive force claim.

### 3.     Substantive Due Process

The Court next examines Plaintiff's federal claim against Defendant Castillo under the substantive-due process standard articulated by the Supreme Court in Lewis, 523 U.S. at 853-54.[2]  Under this standard, Plaintiff must prove that Defendant Castillo's conduct "shock[s] the conscience."  Id. at 855; accord Childress, 210 F.3d at 1157; Radecki v. Barela, 146 F.3d 1227, 1230 (10th Cir. 1998).  "'[I]n a high-speed automobile chase aimed at apprehending a suspected offender . . . only a purpose to cause harm unrelated to the

---

[2]To the extent that Defendant Gonzales' conduct is governed by principles of substantive due process by virtue of his participation, or failure to intervene, in the conduct of other deputies, he is entitled to qualified immunity with respect to Plaintiff's substantive-due-process claims for the same reasons that Defendant Castillo is entitled to qualified immunity with respect to those claims.

legitimate object of arrest' is sufficiently 'shocking to the conscience' to establish a due process violation." Childress, 210 F.3d at 1157 (quoting Lewis, 523 U.S. at 836). In this context, an officer's "deliberate or reckless indifference" is not sufficient to shock the conscience. Lewis, 523 U.S. at 836.

Here Plaintiff argues that Defendant Castillo's conduct was conscience-shocking because the sheriff's deputies involved in the pursuit allegedly did not follow standard police procedures and training. According to Plaintiff, "[t]he only apparent explanation for these deputies to have '[thrown] their training out the window' in this manner was because they were angry that Mr. Ronquillo and Mr. Munoz had the audacity to flee from them." [Doc. No. 96, at 23.]

The Court disagrees with Plaintiff's reasoning. The evidence in the record does not support a reasonable inference that Defendant Castillo or other sheriff's deputies intended to harm Plaintiff's decedent simply because they were angered by his audacity. In particular, Plaintiff presents no evidence that Defendant Johnston lacked reasonable suspicion, or harbored any improper motive, when he initially attempted to conduct a traffic stop based on the similarity and proximity of the black pickup truck to the vehicle and location identified in the dispatch regarding the alleged domestic-violence incident. Inasmuch as the undisputed facts show that the attempted traffic stop was justified by reasonable suspicion, the occupants of the pickup truck had no legal justification for fleeing from that stop, and the sheriff's deputies had probable cause to believe that the subsequent conduct of the two individuals in the pickup truck was not only audacious; it was also criminal.

In <u>Lewis</u>, 523 U.S. at 855, the Supreme Court rejected a similar argument that officers violated substantive due-process principles by pursuing a suspect on a high-speed chase. The Court reasoned that where the suspect's "outrageous behavior was practically instantaneous, and so was . . . [the officer's] instinctive response," the officer pursuing the suspect "had done nothing to cause . . . [the suspect's] high-speed driving in the first place, nothing to excuse his flouting of the commonly understood police authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage him to race through traffic at breakneck speed." Even though the officer's decision to pursue the suspect on a high-speed chase may have been imprudent, "the officer's instinct was to do his job as a law enforcement officer, not to induce . . . [the suspect's] lawlessness, or to terrorize, cause harm, or kill." <u>Id.</u> Under the circumstances, the Supreme Court concluded there was no reason to believe that the officer's conduct was "tainted by an improper or malicious motive on his part." <u>Id.</u>

In other cases where deadly force was used during a police chase, or where death resulted from such a chase, the Tenth Circuit has similarly concluded that the evidence did not support a reasonable inference that officers had the requisite intent to harm, even under the less stringent standard that preceded the Supreme Court's opinion in <u>Lewis</u>. <u>See, e.g.</u>, <u>Childress</u>, 210 F.3d at 1158; <u>Latta</u>, 118 F.3d at 702; <u>Bella</u>, 24 F.3d at 1258; <u>Rowe v. City of Marlow</u>, 116 F.3d 1489, 1997 WL 353001, at *5 (10th Cir. 1997) (unpublished disposition). These authorities also suggest that there is no clearly established law that would defeat qualified immunity on this type of claim.

-37-

For these reasons, the Court concludes that Plaintiff has failed to establish a substantive due-process violation.  The Court further concludes that, based on the state of the law on the date of the incident, Defendant Castillo is entitled to qualified immunity on Plaintiff's substantive due-process claim.

In reaching these conclusions, the Court expresses no opinion about whether Defendant Castillo or any other Defendant was negligent or might be held liable under the tort law of the State of New Mexico.  In this regard, the Court is careful to distinguish the high level of culpability required to establish a substantive due-process violation in this context from the "lowest common denominator of customary tort liability." Lewis, 523 U.S. at 848.  The Supreme Court has repeatedly emphasized that "the Fourteenth Amendment is not a 'font of tort law to be superimposed on whatever systems may already be administered by the States,'" and that "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." Id. at 848-49 (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)). For these reasons, the Court's conclusion that there was no due-process violation in this case does not imply that there can be no tort liability under state law.

### C.   Plaintiff's State-Law Claims

In addition to the federal claims referenced in the preceding discussion, Counts III through VIII of Plaintiff's *Complaint* assert a variety of tort claims against Defendants under state law.  All of the claims in Counts III through VIII arise under the laws of the State of New Mexico, and this Court does not have original jurisdiction over them.  Rather, these

state-law claims are before this Court only by virtue of the supplemental jurisdiction conferred by 28 U.S.C. § 1367(a).

"The district courts may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. § 1367](a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Having granted summary judgment or dismissal with respect to all of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.  See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).

In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.  See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995).  The Court is not convinced that these factors weigh in favor of retaining jurisdiction.  In this regard, the Court notes that several of Plaintiff's tort claims raise novel and complex issues of state law, such as whether the scope of the waiver of sovereign immunity contained in the New Mexico Tort Claims Act should be construed to allow a claim for a law enforcement officer's negligent operation of a firearm, and the extent to which principles of comparative fault may apply to intentional tortfeasors.  See 28 U.S.C. § 1367(c)(1) (providing that a federal district court may decline to exercise supplemental jurisdiction over a controversy that "raises a novel or complex issue of State law").  Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to

the contrary.  See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir.

1990).   In addition, the Court's decision to decline supplemental jurisdiction is not

necessarily fatal to Plaintiff's state-law claims, as federal law provides for the tolling of any

limitations period.  See, 28 U.S.C. § 1367(d).

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that Defendants Gonzales and Castillo

are entitled to qualified immunity with respect to Plaintiff's federal claims under 42 U.S.C.

§ 1983.   Having disposed of all of Plaintiff's claims arising under federal law, the Court

declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.

**IT IS, THEREFORE, ORDERED** that  ***Defendant James Gonzales' Motion for***

***Summary Judgment on Section 1983 Claims*** [Doc. No. 75] is **GRANTED**.

**IT IS FURTHER ORDERED** that ***Defendant Richard Castillo's Motion for***

***Summary Judgment #1 - Section 1983 Claims*** [Doc. No. 86] is **GRANTED**.

**IT IS FURTHER ORDERED** that all remaining claims in Counts I and II of

Plaintiff's *Complaint* are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that ***Defendant Richard Castillo's Motion for***

***Summary Judgment #2 - State Law Tort Claims*** [Doc. No. 90] is **DENIED WITHOUT**

**PREJUDICE**.

**IT IS FURTHER ORDERED** that all state-law claims in Counts III, IV, V, VI, VII, and VIII of Plaintiff's *Complaint* [Doc. No. 1] are **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED**, this 30th day of July, 2003, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
*United States District Judge*